## Case No. 16,593.

### UNITED STATES v. ULLMAN.

[4 Ben. 547; [1] 13 Int. Rev. Rec. 68.]

District Court, S. D. New York. Feb., 1871.

TARIFF ACTS—CONSTRUCTION—COMMERCIAL DESIGNATION—COPPER AND DUTCH METAL.

1. The tariff act of March 2, 1861 [12 Stat. 178], imposed a duty of 10 per cent. on "Dutch metal," and of 30 per cent. on manufactures, not otherwise provided for, of brass, copper or other metal, "or of which either of these metals, or any other metal, shall be the component material of chief value." The tariff act of February 24, 1869 [15 Stat. 274], imposed a duty of 45 per cent. on "all manufactures of copper, or of which copper shall be a component of chief value, not otherwise herein provided for." Held, that, under the tariff acts, brass must be taken to be a metal, as well as copper, and that, if Dutch metal was a manufacture of brass, although copper was the chief component of brass, yet Dutch metal would not be included in the act of 1869, as being a manufacture of which copper was a component of chief value.

[Cited in Arthur v. Sussfield, 96 U. S. 130.]

2. In cases of serious ambiguity in the language of a tariff act, or doubtful classification of articles, or vague or doubtful interpretation,

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

the construction of the act is to be in favor of the importer.

3. It is not the province of the jury to construe the law, but to receive the construction from the court.

This was an action to recover duties alleged to be due to the United States on an importation of "Dutch metal," made by the defendant [Sigismund Ullman], and entered at the custom house at New York, by him, on the 29th of March, 1869. The value of the importation was $1,067, in gold. The collector exacted from the defendant a duty thereon of 10 per cent. ad valorem, amounting to $106.70, in gold, which was paid by him, and the goods were delivered to him. It was now claimed, that a duty of 45 per cent. ad valorem on such value should have been paid on $988 worth of the goods. This suit was brought to recover, as the proper difference, $345.80, in gold, with interest from March 29, 1869. The claim was based on the ground, that a duty of 45 per cent. ad valorem was imposed on the goods by the act of February 24, 1869 (15 Stat. 274), entitled "An act regulating the duties on imported copper and copper ores." That act provides, "that, from and after the passage of this act, in lieu of the duties heretofore imposed by law on the articles hereinafter mentioned, there shall be levied, collected, and paid on the articles herein enumerated and provided for, imported from foreign countries, the following specified duties and rates of duty, that is to say: On all copper imported in the form of ores, three cents on each pound of fine copper contained therein; on all regulus of copper, and on all black or coarse copper, four cents on each pound of fine copper contained therein; on all old copper fit only for remanufacture, four cents per pound; on all copper in plates, bars, ingots, pigs, and in other forms not manufactured or herein enumerated, including sulphate of copper or blue vitriol, five cents per pound; on copper in rolled plates, called braziers' copper, sheets, rods, pipes, and copper bottoms, eyelets, and all manufactures of copper, or of which copper shall be a component of chief value, not otherwise herein provided for, forty-five per centum, ad valorem."

On the 7th of May, 1869, the secretary of the treasury issued a circular to the officers of the customs (9 Int. Rev. Rec. 172), in which, after reciting the said act, he said: "The question has been presented to this department, whether 'bronze powders' and 'Dutch metal' are properly liable to duty under the act in question. It is the opinion of the department that the articles named are manufactures, and it is understood that they are composed in part of copper. The principal question remaining is, whether copper is the component of chief value in such manufactures. If this be so, and the articles are not otherwise provided for in said act, they are liable to a duty of forty-five per centum, ad valorem."

On the 14th of July, 1869, the secretary of

the treasury made a decision (10 Int. Rev. Rec. 26, 163), in which he said, in a letter to a firm which had imported stamped brass goods in May, 1869: "As, in all articles made of the composition usually known as brass, copper is the component of chief value, the goods imported by you were subject to" a duty of forty-five per cent. ad valorem, under the act of February 24, 1869. "The position taken by the collector is correct, in regard to the material of which brass is composed; and, as the law in question includes all articles of which copper is the component of chief value, his action in assessing said duty was correct. The fact, that brass and many other articles of which copper forms the principal part, have other distinctive names, and are never known as manufactures of copper, in the commercial world, cannot be deemed to affect the question, under the very comprehensive language of the act referred to."

On the 19th of July, 1869, the secretary of the treasury made a decision (10 Int. Rev. Rec. 25), on an appeal from a decision of the collector of the port of New York assessing duty at the rate of forty-five per cent. on certain Dutch metal and bronze powder, imported into that port in June, 1869. The secretary said: "The language of the act of February 24, 1869, is very comprehensive, and, in the opinion of this department, embraces every manufacture of which copper is the component of chief value, whether the copper be the simple metal, or in the form of an alloy, or combination of chemicals, or otherwise, with any other article or articles."

On March 29, 1869, the defendant entered at the custom-house an invoice of "Dutch metal," and the duty was, by the entry clerk, estimated at ten per cent., under the tariff act of March 2, 1861 [12 Stat. 178]. The appraiser, April 15, 1869, returned the article as "Dutch metal, at ten per centum, ad valorem." May 19, 1869, the collector directed the appraiser to reconsider his return, and "report if copper is a component part of chief value. See secretary's decision, dated May 7, 1869." Thereupon, on June 19, 1869, the appraiser reported the article as "Dutch metal, a manufacture of which copper is component of chief value, at forty-five per centum." Then the collector liquidated the entry at forty-five per cent., instead of ten per cent. The importer refused to pay the difference, and the government brought this suit therefor.

The United States gave evidence tending to show that the proportion of copper entering into Dutch metal was so great, that the rolled sheets of metal out of which it was made could not be called the brass of commerce.

The defendant gave evidence tending to show that such rolled sheets were the brass of commerce, and were an article of commerce, and, as such, were sold and used to make other things besides Dutch metal. The defendant's counsel claimed, that the United States could not recover, unless it was found

that Dutch metal was a manufacture of which copper, as known to the tariff laws, was a component of chief value; that brass was well known to tariff legislation; that the copper act of 1869 did not obliterate brass and its manufactures, or the other metals therein named and their manufactures; and that Dutch metal was not, in the tariff sense, a manufacture of copper, but a manufacture of brass, or of some other alloy. Both parties agreed, that, in the sheets of which the Dutch metal was made, copper was the component of chief value, and that, as an original ingredient, in a chemical sense, copper was the component of chief value among the components of Dutch metal.

When the testimony was closed, the defendant's counsel requested the court to instruct the jury as follows: (1) Brass is an article well known to commerce and the revenue laws, and, if the jury shall find that Dutch metal is manufactured therefrom, as a distinct article, then it is not liable to duty under the copper act of February, 1869. (2) Even if the jury shall find that the chief component material, from which the article out of which Dutch metal is subsequently made, is copper, still, if the result of the first process is a distinct article, known in commerce as brass, or as any other metal, from which the merchandise now in controversy was made, then it is not dutiable under the copper act of February, 1869, as a manufacture of copper. (3) If the jury find that the article in controversy is known in commerce as Dutch metal, then the rate of duty thereon is fixed by the tariff act of March 2, 1861, and their verdict must be for the defendant.

The district attorney requested the court to charge the jury thus: (1) That, if the jury find that Dutch metal is manufactured from a compound of copper and zinc, which compound is made for the purpose of manufacturing Dutch metal, and is made in the proportions requisite to that end, and that the manufacture is a continuous process, begun and continued with a view of producing Dutch metal, then they should find that Dutch metal is not a manufacture of brass, or one of which the component of chief value is brass. (2) That, upon the evidence in this case, it is apparent that Dutch metal is not a manufacture of brass, within the commercial sense of that term, as used in the tariff acts. (3) That the designation, "Dutch metal," if it be the name of a manufacture of which the component of chief value is copper, is, for that reason, within the act of 1869, notwithstanding it is specifically taxed in former acts. (4) That, even if the article produced, in one state of the process of manufacture, assumes a form or condition which might scientifically be called brass, yet that circumstance, if the intention was to produce Dutch metal by the completed process, does not make the article produced a manufacture of brass. (5) That the components of such an article are to be ascertained by reference to its bases, and not to intermediate accidents or incidents. (6) That the article of which Dutch metal is manufactured, which is described as "Lahn gold," by some of the witnesses, is not a "metal," within the meaning of the acts of congress. (7) That said article is an alloy, and not a metal, either in the arts or in law. (8) That, whether a metal or an alloy, if it is produced as part of the process of manufacturing Dutch metal, and for the purpose of accomplishing that manufacture, the Dutch metal produced is not to be deemed a manufacture of such alloy or metal, but of the articles used as the bases of the whole manufacture.

Noah Davis, U. S. Dist. Atty., and Henry E. Davies, Jr., Asst. U. S. Dist. Atty.
Sidney Webster, for defendant.

BLATCHFORD, District Judge (charging jury). This is an action brought by the United States against Sigismund Ullman, to recover a sum of money as due by him to the United States. Under the laws of the United States, if goods are imported upon which duties are imposed by law, and those goods, rightfully or wrongfully, by the permission of the officers of the government, or against their will, come into the possession of the individual who imports them, those duties are a personal debt against the importer, in addition to there being a lien therefor upon the goods, so long as they remain in the possession of the government. The goods now in controversy, as you have seen, passed into the possession of Mr. Ullman, with the full consent and permission of the government authorities; but the government claims, that, although he paid all the duty required of him at the time, which was 10 per cent., ad valorem, he did not pay as much as the law demanded. The government, which can suffer no prejudice by the omissions or mistakes of its officers, brings this suit; and, if it had the right, when these goods were entered at the custom-house, to exact the 45 per cent. which it now demands, it has the same right at the present time. Therefore, the question in this case is, simply, whether these goods, at the time they were entered were liable to a duty of 45 per cent., ad valorem, under the act of 1869.

This is not a case of fraud or undervaluation, and of seizure, which is a frequent shape in which revenue cases come before this court. If 45 per cent. in this case had been demanded of Mr. Ullman at the time, it might have been paid under protest, and then, if he complied with all the forms, he could have brought suit against the collector in the circuit court for this district, or in the state court, whence it would have been removed into the circuit court. But, in that case, the same rules of law would have been applicable. The collector who levied the duties would in such case be required, as the government is in this case, to show warrant of law, clear and explicit, for exacting the money as and

for duties or taxes. That principle, enforced many times by the courts, was well expressed by Mr. Justice Nelson in a case (Powers v. Barney [Case No. 11,361]), in which he said, in the circuit court for this district, that duties are never imposed upon a citizen in cases of serious ambiguity in the language of an act, or doubtful classification of articles, or vague or doubtful interpretation, and that, in all such cases, the construction must be in favor of the importer.

Now, gentlemen, it is necessary that I should give to you, and you must take from the court, as matter of law, the legal construction of the act of congress of 1869, under which this sum of money is claimed by the government. It is your duty, under your oaths, not merely to give a verdict according to the evidence, but according to the evidence under the law as explained to you by the court. It is not for you to construe the law yourselves. And I refer to this subject because a strong appeal was made to you, in summing up, by the counsel for the government, as to what construction you should put upon this law. It is not your business to put any construction whatever upon the law. That is the business of the court, and it would be as proper, and as consonant with the administration of justice, for the counsel for the defendant to appeal to you to construe this law in one way because you are in favor of a low tariff, as it is for the counsel for the government to appeal to you to construe the law in another way because you are advocates of a high tariff. That has nothing to do with this trial. Those considerations are considerations proper to arise in congress on the enactment of the law. They have no place in a court of justice; much less have they anything to do with the functions of a jury. I speak strongly, not only for the reason just stated, but also for the further reason, that this principle is a result of the wisdom of courts of justice and of judges, for years, under the Anglo-Saxon system. The rule is, that the law must be taken from the court. And why? Because, unless you do so take it, you must necessarily do wrong to one side or the other in the controversy. In this case, if the court should lay down the law to you in one way, and you should construe it in another way, the party against whom your verdict should be rendered would be utterly without remedy, because the court would have construed the law in a manner perhaps unobjectionable to such party, and yet you would have construed it in a way objectionable to him. A party can have no remedy against a wrong construction of the law by the jury; but he can against an erroneous construction thereof by the court. If the court expounds the law wrongly, then the party who considers himself aggrieved by such a construction has his clear remedy. But, of that remedy one or the other party must be deprived, if the jury do not take the law as the court gives it to them. If the court is wrong, an exception

may be taken, and the case can be carried up regularly to a higher tribunal, and the error be corrected.

There is no question that the article in this case is Dutch metal, and no question that it comes within the description of what, in the statutes of the United States imposing duties, is called Dutch metal. A duty of ten per cent., ad valorem, is imposed by the 19th section of the act of March 2, 1861 (12 Stat. 187), on "Dutch and bronze metal, in leaf." The 22d section of the same act imposes a duty of thirty per cent., ad valorem, upon "manufactures, articles, vessels, and wares, not otherwise provided for, of brass, copper, gold, iron, lead, pewter, platina, silver, tin, or other metal. or of which either of these metals, or any other metal, shall be the component material of chief value." Under this 22d section, there is no doubt that Dutch metal would be liable to thirty per cent. duty, but for the fact that it is otherwise provided for in the same act, by name, as "Dutch metal," and subjected to a duty of ten per cent.

The 13th section of the act of July 14, 1862 (12 Stat. 557), imposes an additional duty of five per cent., thus raising the duty to thirty-five per cent., on "manufactures, articles, vessels, and wares, not otherwise provided for, of gold, silver, copper, brass, iron, steel, lead, pewter, tin, or other metal, or of which either of these metals, or any other metal, shall be the component material of chief value." The same remarks that I have made in regard to the act of 1861 apply to this act of 1862. Dutch metal would be liable to thirty-five per cent. duty under this act of 1862, taken in connection with the act of 1861, but for the fact that it is otherwise provided for, that is, provided for by name, as "Dutch metal," in the act of 1861.

It is to be noticed, in respect to the provisions of these two acts, that they contain the same specification of metals, except that platina is in the first act and not in the second, and steel is in the second act and not in the first. It is also to be noticed, that articles are spoken of as metals, in the provisions in both acts, which, in a scientific sense, are not called metals. Gold, silver, copper, iron, lead, platina, and tin are scientifically metals, because they are found in a native state in the earth, in the condition in which they are properly known by these several names. But brass is not found as a native metal. It is an alloy of copper and tin or copper and zinc. So, pewter is an alloy of lead and tin. So, steel is iron carbonized with a certain proportion of carbon. Thus congress has described as metals gold, silver, brass, copper, iron, steel, lead, pewter, platina, and tin, and speaks of them as "these metals." thus specifically saying that they are metals. It thus gives the name of a "metal" to brass, to pewter, and to steel. In thus saying, in these two acts, that copper is a metal and brass is a metal, the declarations are as clear and dis-

tinct as if they read thus: "We, the congress of the United States, hereby declare, that, in these statutes, we regard copper as a metal and also brass as a metal."

Then we come to the act of 1869 (15 Stat. 274), under which the present question arises. It was passed on the 24th of February, 1869, and provides, "that, from and after the passage of this act, in lieu of the duties heretofore imposed by law on the articles hereinafter mentioned, there shall be levied, collected, and paid on the articles hereinafter enumerated and provided for. imported from foreign countries, the following specified duties and rates of duty, that is to say." It then imposes a duty of 45 per cent., ad valorem, on "all manufactures of copper, or of which copper shall be a component of chief value, not otherwise herein provided for." The words, "a component of chief value," mean the same thing as the expression used in the previous acts, "the component material of chief value;" because, an article composed of several materials can have but one of chief value, unless there happen to be two materials of equal and of the greatest value in them. Therefore, the statute must be read as if the words were, "of which copper shall be a component, and the component of chief value." This act of 1869 must be read in connection with the prior acts of 1861 and 1862, wherein congress had placed a duty of thirty-five per cent. upon copper, brass, and other metals, and had recognized brass as a metal, although it must contain copper, and although copper is necessarily the component material of chief value therein. Then congress, by the act of 1869, took out copper alone from the operation of the acts of 1861 and 1862. Congress took out no other metal. They did not take out brass. They left brass to be subject to thirty-five per cent. duty. They took out every article which "is a manufacture of copper, or of which copper shall be a component of chief value, not otherwise herein provided for." If it were not for the word "herein," we should not probably be here trying this case. If the words were merely "not otherwise provided for," that would mean, "otherwise provided for in existing acts," and we should be remitted to the act of 1861, wherein Dutch metal is dutiable at ten per cent. ad valorem. But the act says. "not otherwise herein provided for." Therefore, Dutch metal is liable to a duty of 45 per cent., not being provided for in any place in this act of 1869, unless in the 45 per cent. clause, if it is, in the sense of that act, a manufacture of which copper is the component of chief value. Under the acts of 1861, 1862, and 1869, Dutch metal is not a manufacture of which copper is the component of chief value, if it is a manufacture of which brass is the component of chief value; that is, if the copper and the zinc which enter into the composition of Dutch metal do assume, in the judgment of the jury, upon the evidence in the progress toward Dutch metal from the raw copper and the raw zinc, the condition of brass, in the sense of the brass of commerce, and as the word "brass" is used in the acts of 1861 and 1862, then Dutch metal is a manufacture of brass, and, being thus a manufacture of brass, it is not a manufacture of copper. within the meaning of the act of 1869. Therefore, it is, on the evidence in this case, for you to determine. whether, in point of fact, the government has shown to you, satisfactorily, by a preponderance of evidence, that this article is dutiable under the act of 1869.

I have said, "a manufacture of brass," but the principle is equally applicable if it be a manufacture of any other thing which can properly be called a metal. You will recollect the testimony of Mr. Ullman. He was asked what he was in the habit of ordering, if he wished to purchase the sheets made of copper and zinc to manufacture Dutch metal, and he said that he ordered number four metal or number two metal, as the case might be, according to the number of the Dutch metal which he desired to make. The principle I have laid down applies equally in case you shall find that the alloy of copper and zinc had entered into a state in which it became an article of commerce, as a metal, whether as brass or "any other metal." That is the sole question of fact for you to determine. I will recall to your attention the evidence of the witnesses on the subject. There was, in the first place, Mr. Spitzer, a government witness, who had, as custom-house examiner, something to do with this case in the custom-house, but who never saw the particular articles composing this invoice. The gentleman who saw the articles and examined them, and made a legal appraisement of them, was Mr. Sackreiter, who was not called before you as a witness. Mr. Spitzer went through a species of appraisement unknown to the laws of the United States, by appraising an article without seeing it. He had seen Dutch metal generally; but he had not seen the particular article imported in this case. Mr. Spitzer says, that his understanding of it is, that you cannot make such Dutch metal as he knows the Dutch metal imported into this country to be, with a less proportion of copper than 80 per cent. of copper to 20 per cent. of zinc; and that, if you have a less proportion of copper than 80 per cent. you cannot get the pliability, the ductility, or the capacity of being beaten out to the necessary thinness without breaking, which you must have in this article. He also says, that an article containing the proportions of 80 per cent. of copper to 20 per cent. of zinc is not the brass of commerce, in his judgment. Then he was asked to say what proportions of copper and zinc he would call the brass of commerce. He said, that, from 50 of copper and 50 of zinc to 65 of copper and 35 of zinc he would call the brass of commerce. He also states, that he has known a com-

pound to be made in the United States with the proportions of 60 per cent. of copper to 40 per cent. of zinc, and to be bought here and sold as yellow metal and as button metal.

Of the same character is the testimony of Mr. Brandeis, an exceedingly intelligent gentleman, judging from his bearing and manner of testifying, and a chemist evidently of experience and learning. He states, that the smallest proportion of copper that will answer to make Dutch metal is 73 per cent., that, if you have less copper that that, you cannot get the qualities that are necessary, the ductility, the pliability, and the capacity of being beaten thin; and that less than 73 per cent. of copper to 27 of zinc will not answer. He also states, that, in his experience, he knew of the importation of some of these rolled sheets, which one of the witnesses denominated "sheet brass," and which another witness stated was called, in German, Lahn gold—that he knew of one importation of that article into this country, which he used himself here for the purpose of making this Dutch metal leaf out of it. He also states what he considers to be the brass of commerce; that the average of the brass of commerce contains 60 per cent. of copper to 40 per cent. of zinc; and that, if you have more than 66 2-3 per cent. of copper, you do not have the brass of commerce—that you must have either 66 2-3, or less than 66 2-3, per cent., of copper.

On the part of the defendant, you have three witnesses, Mr. Ehrmann, Mr. Meier, and Mr. Ullman, all of them connected with this trade, interested in it, and all of them frankly stating that they have controversies on the subject, and, as importers of this article, are interested in getting it into the country at as low a duty as possible, and in maintaining the 10 per cent. duty for the sake of their own business. Nevertheless, they have appeared before you, and you have seen their manner of testifying, and heard their evidence, and you are to weigh that evidence, in connection with the evidence on the part of the government, and give to it all the strength and force to which you may consider it to be entitled.

Mr. Ehrmann testifies, that the rolled sheets, composed of copper and zinc, which are first hammered by steam, and then beaten further by hand, to make Dutch metal, are, in the shape in which they are purchased to be hammered by steam, bought and sold as an article of commerce; that they are sold to go to Russia, to the East Indies, and to countries where Dutch metal is not made; that they are sold in Germany, not only for the purpose of making Dutch metal, but to be used there, and that they are used there, to make the polished surfaces of knives, which you see through the tortoise-shell on the handles, and to make toys, and to make buttons, and ornaments for theatrical dresses. Mr. Ehrmann also states, that, of the various numbers of Dutch metal, which numbers are given according to the shades of color, three-fourths of the entire quantity that is made in the region of country in Bavaria where it is made, is No. 4; and the invoice in question in this suit shows, that nearly one-half of the Dutch metal involved in this case is No. 4. In regard to this No. 4, Mr. Ehrmann testifies, from his acquaintance with the trade, in buying these sheets from which to make Dutch metal, that the component parts of No. 4 are 65 per cent. of copper to 35 per cent. of zinc, or an average of 60 of copper to 40 of zinc. Now, 60 to 40, thus stated by Mr. Ehrmann to be the average in No. 4 Dutch metal, are precisely the proportions which Mr. Spitzer and Mr. Brandeis say they would understand to be the brass of commerce. Mr. Meier, another witness for the defence, states, that these rolled sheets are an article of commerce in Germany, and are used for the purpose of making Dutch metal, and also for ornamenting in theatres, and for toys. Mr. Ullman, the defendant, says, that the firm in Germany with which he is connected buys these sheets in the open market, and beats them by steam, and then sells them in that condition, and buys back the Dutch metal, which is sent out to this country. He says the sheets are an article of commerce in Germany, and that they are used to make watches, and artificial flowers, and ornamentation for theatres, as well as Dutch metal; and that, when his firm in Germany wishes to buy these sheets, it orders so much metal, of such a number. It is for you to say, on all the evidence, whether the government has satisfied you that this Dutch metal is a manufacture of which copper is a component of chief value. If the government has not satisfied you of that fact, then it cannot recover in this suit.

I believe I have thus explained every question that arises in the case, and I charge you substantially in accordance with the first two prayers submitted on the part of the defendant, and decline to charge in accordance with any of the prayers submitted on the part of the government.

The jury thereupon retired, and, after deliberation, returned a verdict for the defendant.